128 N.J. Super. 66 (1974)
319 A.2d 80
THEODORE BRUNSON, ET AL., PLAINTIFFS,
v.
RUTHERFORD LODGE NUMBER 547 OF THE BENEVOLENT AND PROTECTIVE ORDER OF ELKS, ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided February 22, 1974.
*69 Mr. Lawrence I. Lerner, attorney for plaintiffs (Mr. John R. MacKay, II, of counsel).
Mr. Charles L. Bertini, attorney for defendants Rutherford Lodge Number 547 of the Benevolent and Protective Order of Elks, a New Jersey corporation, and Rutherford Lodge Number 547 of the Benevolent and Protective Order of Elks of the United States of America.
Mr. M. Harry Muser, attorney for defendants Edward McLaughlin, Assessor and the Mayor and Council of the Borough of Rutherford.
Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney for defendant Bergen County Board of Taxation (Mr. Hal R. Crane, Deputy Attorney General, appearing).
*70 ACKERMAN, JOHN A., J.S.C.
This matter presents for the first time in this State the question whether the granting of a property tax exemption under the newly enacted exemption statute for fraternal organizations, N.J.S.A. 54:4-3.26, adopted in 1971, to an Elks Lodge which adheres to or is governed by an "all-white" membership policy is violative of the 14th Amendment to the Federal Constitution and Art. I, pars. 1 and 5, of the 1947 State Constitution.

I
The action has been drastically changed and limited in its scope since it was instituted late in 1970 and some reference thereto is desirable in order to understand the scope of the relief sought by plaintiffs. It was orginally designed as a class action attacking all tax exemptions and all liquor licenses granted to all Elks lodges in the State of New Jersey. The complaint was filed by 21 individuals, 8 being citizens and taxpayers of Nutley in Essex County and 13 being citizens and taxpayers of Rutherford in Bergen County, suing on behalf of themselves and "all other citizens of other municipalities * * * similarly situated." Defendants specifically named were the Nutley and Rutherford Elks Lodges and Corporations,[1] the municipal governing bodies and tax assessors of both municipalities, the Essex and Bergen County Boards of Taxation, the Acting Director of the Division of Taxation, and the Director of the Division of Alcoholic Beverage Control, all of whom were served and answered. Also named as defendants were "all other Municipal Tax Assessors, *71 County Boards of Taxation, Municipal Governing Bodies [and] Elks Lodges similarly situated."
The gravamen of the complaint with respect to taxes was that there was no statutory authority for exemptions granted to Elks lodges, either under the charitable exemption section, N.J.S.A. 54:4-3.6, or under the fraternal organization exemption section, N.J.S.A. 54:4-3.26, as it then stood. Plaintiffs charged that Elks lodges were not exempt under N.J.S.A. 54:4-3.6 because their properties were not exclusively used for charitable purposes nor were they organized exclusively for charitable purposes. They further charged that any exemptions purportedly granted to Elks lodges under N.J.S.A. 54:4-3.26 as it then existed were absolutely nugatory since that statute had been held in Rutgers Chapter of Delta Upsilon Fraternity v. New Brunswick, 129 N.J.L. 238 (Sup. Ct. 1942), aff'd 130 N.J.L. 216 (E. & A. 1943), not only to be unconstitutional, as violative of the "uniformity of taxation" provision of the then 1844 State Constitution because it excluded exemptions for college fraternities, but also to be void in its entirety because the exclusion of exemptions for fraternities was an integral part thereof. It was further asserted that, in any event, any exemptions granted to the Rutherford and Nutley Lodges and to other Elks lodges in the State were violative of the State and Federal Constitutions because such local lodges were a part of a national organization which expressly excluded non-whites from membership and because said lodges in fact followed the policy and practice of excluding non-whites. Relief sought with respect to taxes was not only the withdrawal of exemptions for the current tax year 1971 as well as for future years, but also the recovery of back taxes from each Elks Lodge. With respect to liquor licenses, plaintiffs sought the revocation of such licenses granted to the Nutley and Rutherford Lodges and to all other Elks lodges on the ground that the same were unlawfully granted in view of their racially discriminatory membership policies and practices.
*72 Following a preliminary pretrial conference to work out a schedule for the further conduct of the litigation and for the determination of challenges to the ability to maintain a class action and to the right to some portions of the relief sought, the court heard certain motions and issued an unpublished opinion in which it ruled that a class action as contemplated by plaintiffs could not be maintained and that, unless taxpayers of other municipalities were added as named plaintiffs and additional Elks lodges were named as direct defendants, plaintiffs would be limited to attacks on the exemptions and liquor licenses of the Nutley and Rutherford lodges alone.[2]
*73 I also made rulings with respect to the necessity of exhaustion of administrative remedies by plaintiffs. In view of the nature of the tax questions involved and the fact that different county tax boards would be involved with the possibility of diverse decisions and multiple appeals, I held that exhaustion of administrative remedies with respect to the tax matters would be waived and jurisdiction would be exercised by the court. Farmingdale Realty Co. v. Farmingdale, 55 N.J. 103, 112 (1969); Matawan v. Monmouth Cty. Board of Taxation, 51 N.J. 291, 296-297 (1968). With respect to the matter of liquor licenses, however, since the Director was the sole administrative agency involved and there was no danger of conflicting decisions from his office, and since he had broad powers to initiate suspensions if he deemed them warranted, see Liptak v. Division of Alcoholic Beverage Control, 44 N.J. Super. 140 (App. Div. 1957), and to consolidate cases and take other steps to simplify hearings, see Pleasantville Taxpayers v. Pleasantville, supra, 115 N.J. Super. at 90, I ruled that administrative remedies before the Director had to be resorted to and exhausted.
Following this ruling the plaintiffs decided not to add any new parties plaintiff or defendant and, accordingly, only the tax matters with respect to the Rutherford and Nutley Lodges remained before the court.
In the latter part of 1971, after much public discussion, the Legislature enacted a new exemption for fraternal organizations, applicable to the tax year 1972 and thereafter, and amended N.J.S.A. 54:4-3.26 to read as follows:
*74 All real and personal property used in the work and for the purposes of one or more fraternal organizations or lodges, or any association or society organized on the lodge plan, or affiliated associations, whether incorporated or unincorporated, shall be exempt from taxation under this chapter, if the legal or beneficial ownership of such property is in one or more of said organizations, lodges, associations or societies, and no part of such property is used for pecuniary profit, provided that each such organization, lodge, association or society is also organized and operated in substantial part for charitable or educational purposes and demonstrates these aims in its programs and activities.
Apart from the provision excluding exemptions for college fraternities, which was eliminated, the new statute contained exactly the same language as the predecessor statute except for the added proviso that, in order to qualify for exemption, a fraternal organization must be organized and operated in substantial part for charitable or educational purposes and demonstrate these aims in its programs and activities. In December 1971 the Division of Taxation issued guidelines for the implementation of the new statute to assessors and county tax boards. These provided in part as follows:
2. With respect to the requirement that such organizations must be organized and operated in "substantial part" for charitable and educational purposes, the following guidelines have been established for interpreting the qualifying phrase "substantial part" as it relates to income:
(a) The financial statement of an applicant must substantiate the fact that a minimum of 33 1/3% of its net income and at least 10% of its gross income from all sources for the pretax year has been applied to charitable or educational purposes.
As stated above, the proviso requiring substantial charitable activities by qualifying fraternal organizations added a new element which was not required for exemption under the terms of the old statute. It had been held under the old statute, prior to the decision in the Rutgers case in 1943, that it was void in its entirety, that an Elks lodge was entitled to exemption so long as its property was not used for pecuniary profit. Hoboken v. Hoboken Lodge No. 74, B.P.O.E. of *75 America, 123 N.J.L. 506 (Sup. Ct. 1939); Elk Realty Co. of Nutley v. Nutley, 18 N.J. Misc. 691, 16 A.2d 202 (St. Bd. Tax App. 1940); Trenton Lodge No. 105, B.P.O.E. v. City of Trenton, 18 N.J. Misc. 513, 15 A.2d 97 (St. Bd. Tax App. 1940); see Camden v. Camden Cty. Board of Taxation, 121 N.J.L. 262 (Sup. Ct. 1938), aff'd 122 N.J.L. 381 (E. & A. 1939). Any problems arising from mistaken but continued application of the old exemption statute after the Rutgers case and from lack of strict adherence to the law after that decision by local assessors (See Report of Commission to Study the Laws of New Jersey Exempting Real Property Held by Religious, Educational, Charitable, and Philanthropic Organizations and Cemeteries from Taxation (January 30, 1970), 18-21, 41) were avoided and rendered moot by the adoption of the new statute, at least so far as the future was concerned, and it was clear that from 1972 on a fraternal organization had to be organized and engaged in substantial part in charitable or educational work in order to qualify for an exemption.
In view of the new enactment and doubts as to the extent to which plaintiffs would be entitled to recoupment of back taxes, even if they were successful, the court made a suggestion, to which all parties agreed, that the issues be moulded to eliminate plaintiffs' challenges to past exemptions and their attempts to recover past taxes and to focus their attacks on current exemptions granted or to be granted to the Nutley and Rutherford Lodges and to test the applicability and constitutionality of the new exemption statute with respect to those two lodges. In May 1972 the original complaint was dismissed. An amended complaint was filed asserting that neither the Nutley nor the Rutherford Lodge was entitled on the facts to an exemption under either N.J.S.A. 54:4-3.6 or the new exemption statute, N.J.S.A. 54:4-3.26, and charging that any such exemptions, if granted, were unconstitutional because of the racially discriminatory Elks' membership policies and practices. No relief was sought with respect to past exemptions or past taxes, nor was there any *76 attempt to maintain a class action affecting other Elks lodges. No relief was sought as to liquor licenses, and the Director of Alcoholic Beverage Control was not made a party to the amended action.
Thereafter the action was further limited. It was determined that the Nutley Elks Lodge had not been granted an exemption for the tax year 1972. The action was therefore dismissed as to that lodge, the tax assessor and Board of Commissioners of Nutley, and the Essex County Board of Taxation. Subsequently, the eight Nutley plaintiffs were withdrawn from the case. The case thus resolved itself into one involving only the Rutherford Lodge. After extensive discovery and denials of motions for summary judgment, the matter came on for trial. Prior to trial the action was dismissed by consent as to the Director of the Division of Taxation. In addition, although the current tax exemption for the Rutherford Lodge had been applied for and granted only under the charitable exemption section, N.J.S.A. 54:4-3.6, and not under the new fraternal organization exemption statute, all the parties agreed at the trial that, if the lodge were in fact entitled to an exemption under the terms of the latter section, even though not under the charitable exemption section, the court should so find and rule upon the constitutional issue. The issues were thus finally drawn so that the constitutional issues were presented if the ladge met the terms of either exemption statute.

II
On the basis of the evidence at the trial, I have made certain findings which are set forth hereinafter, and it is apparent therefrom that determination of the constitutional issues cannot be avoided. See Peters v. Hobby, 349 U.S. 331, 75 S.Ct. 790, 99 L.Ed. 1129, 1137 (1954).
First, the Rutherford Elks Corporation, a New Jersey corporation not for pecuniary profit organized in 1906, is the owner of the property at 48 Ames Avenue, Rutherford. *77 It operates and manages the building thereon and permits many associations and corporations organized exclusively for charitable or religious purposes to use the premises. The corporation permits the Rutherford Elks Lodge, the fraternal organization, to also use part of the premises for meetings and activities of the lodge. Each member of the Rutherford Elks Lodge, is automatically a member of the Rutherford Elks Corporation and there are no other members of the corporation. Any person who ceases to be a member of the Rutherford Elks Lodge ceases to be a member of the corporation. Trustees of the Rutherford Elks Corporation are elected at a membership meeting of the Rutherford Elks Lodge and are subject to the control of the lodge. Provision is made in the statutes of the Grand Lodge for the organization of separate corporations and for trustees in the management of property beneficially owned by subordinate lodges, and it is perfectly clear that subordinate lodges and separate corporations, such as the lodge and corporation here, are subject to and bound by the constitution and statutes of the Grand Lodge. See Statutes Annotated, Reissue of 1971, Benevolent and Protective Order of Elks of the United States of America, §§ 114, 122, 128, 170, 208, 209 and 209-A, and opinions thereunder; By-Laws and Rules of Order of Rutherford, New Jersey, Lodge No. 547 (1970), 27. In view of the nature of their activities and their relationship, it is clear that, for the purpose of determining whether there is basis for an exemption and testing the constitutionality thereof, the Rutherford Elks Corporation and the Rutherford Elks Lodge are alter egos. The membership policies of the Grand Lodge and the subordinate lodge apply as well to the corporation.
Second, the Rutherford Elks Lodge is not organized exclusively for the moral and mental improvement of men, women and children or for charitable purposes, nor is the building at 48 Ames Avenue in Rutherford actually and exclusively used for such purposes within the meaning of N.J.S.A. 54:4-3.6. It is, of course, axiomatic that exemptions *78 accorded by the statute must be construed most strictly against one claiming exemption. Congregation B'nai Yisroel v. Millburn Tp., 35 N.J. Super. 67 (App. Div. 1955); Teaneck Tp. v. Lutheran Bible Institute, 20 N.J. 86 (1959). Without reviewing the evidence in detail, it is clear that some of the purposes of the Rutherford Lodge are social and fraternal and that the building is used in part for such purposes. A bar and grill is maintained and meetings of the fraternal order are held in the building. Although its purposes are worthy ones and the lodge does a great deal of good, its purposes are not exclusively charitable nor exclusively for for the moral and mental improvement of men, women and children. The need for the enactment of a special statute for fraternal organizations clearly shows that social and fraternal purposes do not qualify for exemption under N.J.S.A. 54:4-3.6. See Dover v. Knights of Columbus House Ass'n, 24 N.J. Misc. 84, 46 A.2d 376 (Div. of Tax App. 1946); Camden Lodge No. 111, Loyal Order of Moose v. Camden, 135 N.J.L. 532 (Sup. Ct. 1947). The lodge therefore does not qualify for exemption under that section.
Third, I find that the Rutherford Lodge is a fraternal organization, that it is organized and operated in substantial part for charitable or educational purposes, and that it demonstrates these aims in its programs and activities within the meaning of N.J.S.A. 54:4-3.26, as amended in 1971. The proofs satisfy me that no part of the property is used for pecuniary profit within the meaning of that statute. See Elk Realty Co. of Nutley v. Nutley, supra; Trenton Lodge No. 105, B.P.O.E. v. Trenton, supra. Without summarizing the testimony in detail, it is apparent that, taking the combined financial statement of the trustees and the lodge for the fiscal year covering 1971 activities and applying the suggested guidelines prescribed by the Division of Taxation, a minimum of 33 1/3% of net income and at least 10% of gross income from all sources for the pre-tax year had been applied to charitable and educational purposes. This is clear, not only from items of direct expenditures for *79 designated charitable projects but also from apportioning the costs of operation and maintenance of the building which was used in substantial part for charitable purposes. Although the action of the assessor in granting an exemption for the tax year 1972 under N.J.S.A. 54:4-3.6, as applied for by the lodge, was not warranted, the exemption having been granted is sustainable and clearly justified under the terms of N.J.S.A. 54:4-3.26[3].
This brings us head-on into the constitutional question. I find that there is factual basis for the constitutional challenge. The lodge is a private club and not a public facility. Its bar and grill and other facilities are available only to its members and their invited guests, and not to the public generally. As a private club the lodge may follow a socially discriminatory policy and it is not subject to the law against discrimination. See N.J.S.A. 10:5-1 et seq. and authorities cited infra.
It is also clear that its membership policies and practices for the tax years 1972 and 1973 were racially discriminatory. The constitution of the Benevolent and Protective Order of Elks and the statutes thereof have provided for years that membership in the order is limited to "white male citizens" of the United States of America. Because of pending and anticipated constitutional attacks on the validity of the exemptions and liquor licenses, the constitution was amended by the required two-thirds vote of the Grand Lodge at New Orleans, Louisiana, on July 22, 1971 to provide that membership is limited to "white male citizens" but with several provisos. Section 10 (a) was added to the constitution and provides that the "Grand Exalted Ruler, with the consent of the Grand Lodge Advisory Committee, by Executive Order, may abrogate any provision of the Constitution and Statutes deemed to be *80 to the best interest of the Order, which Executive Order shall remain in force until presented for approval or rejection at the next Session of the Grand Lodge." There was no evidence offered that any provision of the constitution or the statutes was abrogated pursuant to this provision.
Section 4 of the constitution was amended in 1971 to read as follows:
Membership in the Order is limited to white male citizens of the United States of America not under twenty-one years of age, and having such other qualifications as may be provided by Statute, provided, however, that the Grand Exalted Ruler may, by Executive Order, grant special dispensation for modification of such membership requirement as he may determine necessary to any Subordinate Lodge that now occupies land or property owned by or under the control of the United States of America.
The provision for special dispensation has no application here because the Rutherford Lodge does not occupy land or property owned by or under the control of the United States of America. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Moreover, there was no proof of the granting of any dispensation under this section modifying the all-white policy to any extent at all.
Section 144 of the statutes of the order, as amended in 1971, contains the same provision as section 4 of the constitution referred to above. It provides, among other things, that "No person shall be accepted as a member of this Order unless he be a white male citizen * * *"
Opinions rendered by the Grand Lodge Committee on Judiciary are reported in annotations to section 4 of the constitution and section 144 of the statutes as amended in 1971, and reproduced in the Constitution and Statutes Annotated, Reissue of 1971, Benevolent and Protective Order of Elks of the United States of America, 21-23 and 209-212. An opinion included in the annotations to both the constitution (Opinion 5 at 22) and the statutes (Opinion 8 at 210) reads in part as follows:
*81 Whether a man is white or not is not a question of previous nationality, or good citizenship. It is a question of Ethnology and the blood that is in his veins. A man may be either white or black and come from Mississippi, Mexico, Hong Kong or Oklahoma. He may have served with distinction in the Military Service of our Country, and still be ineligible to become a member of our Order. The test is whether he is a white male citizen * * *
Opinion 6, at 22 in the annotations to the constitution provides:
Japanese, Chinese, Indians, Koreans and those possessing a mixture of African blood are not of the Caucasian race and therefore are not eligible to membership in our Order.
Opinion 11, at 22 in the annotations to the constitution provides:
This provision, limiting membership to white, male citizens, not under twenty-one years, does not violate the law banning racial segregation, since the Order of Elks is a voluntary, fraternal organization. Each member of the white race has an equal right to be considered for membership and those of other races are equally deprived of that right. A fraternity is not a public institution and has the right to determine its standards for membership. (1957)
The constitution and statutes of the Grand Lodge are, of course, binding upon the Rutherford Lodge. The by-laws of the Rutherford Lodge, applicable to the tax years in question, provide in Article II that "application for membership shall be received only from white male citizens of the United States of America." The only form for application for membership in the Rutherford Elks Lodge received in evidence contains the question, "Are you a white male citizen of the United States of America?" Alhough there was no evidence before me that an application by a nonwhite for membership in the Rutherford Elks Lodge had been formally processed and rejected, there was evidence that such application by one of plaintiffs, a nonwhite, was not fully pressed because the applicant was persuaded by members that the policy of the lodge would result in rejection on racial grounds. Although *82 many members of the Rutherford Elks Lodge may deplore the policies of the National Order and the local lodge and may have exerted strong efforts to have that policy changed, I find that the membership policies of the National Order and of the Rutherford Elks Lodge were racially discriminatory and were adhered to in practice so far as the tax years 1972 and 1973 were concerned.[4]
It is well settled that the Fourteenth Amendment presents no bar to purely private acts of racial discrimination; it bars only state action. As stated in The Civil Rights Cases, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883),
It is state action of a particular character that is prohibited. Individual invasion of individual rights is not the subject-matter of the Amendment. It has a deeper and broader scope. It nullifies and makes void all state legislation, and state action of every kind, which impairs the privileges and immunities of citizens of the United States, ... or which denies to any of them the equal protection of the laws. [109 U.S. at 11, 3 S.Ct. at 21, 27 L.Ed. at 839; emphasis supplied]
*83 The delicate and difficult question to answer is what constitutes "state action of every kind," apart from direct state legislation, which is prohibited by the Amendment? The United States Supreme Court has avoided giving a precise definition of "state action" and has left to the courts the task of deciding on a case by case basis whether state action is involved. In Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the court said:
Because the virtue of the right to equal protection of the laws could lie only in the breadth of its application, its constitutional assurance was reserved in terms whose impression was necessary if the right were to be enjoyed in the variety of individual-state relationships which the Amendment was designed to embrace. For the same reason, to fashion and apply a precise formula for recognition of state responsibility under the Equal Protection Clause is an "impossible task" which "This Court has never attempted." Kotch v. River Port Pilot Comrs. 330 US 552, 556, 91 L. ed 1093, 1096, 67 S Ct 910. Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance. [365 U.S. at 722, 81 S.Ct. at 860, 6 L.Ed.2d at 50]
Definitions of "state action," even though not precise or all encompassing, have been expressed in a variety of ways. In Cooper v. Aaron, 358 U.S. 1, 4, 78 S.Ct. 1401, 1403, 3 L.Ed.2d 1, 9 (1958), the concept of state responsibility under the Fourteenth Amendment was interpreted as necessarily following upon "state participation through any arrangement, management, funds or property." In Burton, supra, where it was held that there was prohibited state action because racial discrimination was permitted in a private restaurant in a public building owned by a State Parking Authority, the court said:
By its inaction, the Authority, and through it the State, has not only made itself a party to the refusal of service, but has elected to place its power, property and prestige behind the admitted discrimination. The State has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as *84 a joint participant in the challenged activity, which, on that account, cannot be considered to have been so `purely private' as to fall without the scope of the Fourteenth Amendment. [365 U.S. at 725, 81 S.Ct. at 862, 6 L.Ed.2d at 52]
In Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 1634, 18 L.Ed.2d 830, 838 (1967), the court approved the concept that prohibited state involvement could be found even where the state could be charged with only encouraging rather than demanding discrimination, and stated that a court must of necessity, in deciding state action cases, "assess the potential impact of official action in determining whether the state has significantly involved itself with invidious discrimination." In Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 488, 15 L.Ed.2d 373, 377, 379 (1966), the court held that state action to aid in the transfer of a park from public to private management in order that segregation could be continued was violative of the Fourteenth Amendment. The court said that "when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies... of the State and subject to its constitutional limitations," and "State courts that aid private parties to perform [a] public function on a segregated basis implicate the State in conduct proscribed by the Fourteenth Amendment."
In Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), the Supreme Court of the United States dealt with the problem of racial discrimination by a private fraternal order as it relates to liquor licenses as distinguished from tax exemptions. There a Negro guest of a white member of the fraternal order was denied service by the lodge's employees solely because he was a Negro, and he sued to have the lodge's liquor license revoked on the state action theory. The court, reversing the holding below, ruled that prohibited state action was not involved and said:
The Court has never held, of course, that discrimination by an otherwise private entity would be violative of the Equal Protection *85 Clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to state regulation in any degree whatever. Since state-furnished services include such necessities of life as electricity, water, and police and fire protection, such a holding would utterly emasculate the distinction between private as distinguished from state conduct set forth in The Civil Rights Cases, supra, and adhered to in subsequent decisions. Our holdings indicate that where the impetus for the discrimination is private, the State must have "significantly involved itself with invidious discriminations," Reitman v. Mulkey, 387 U.S. 369, 380, 87 S.Ct. 1627, 1634, 18 L.Ed.2d 830, 838 (1967), in order for the discriminatory action to fall within the ambit of the constitutional prohibition.
Distinguishing other cases, including Burton, supra, Judge Rehnquist, writing for the majority, noted that the relationship between the state and the lodge arising from its grant of the liquor license was nothing approaching the "symbiotic relationship" between the state agency and the restaurant which discriminated that existed in Burton, where one was lessor and the other lessee of the building and both benefited therefrom.[5]
I am of the opinion, considering all the facts and the terms of this exemption statute, that the allowance of the exemption to the Rutherford Elks Lodge with respect to the property in question involves the state in prohibited state action.
The involvement of the State in the granting of a tax exemption of the type involved here is far different from that in granting liquor licenses. In this State it has long been recognized that there is a symbiotic relationship between the State and the exempt organization and that the latter is relieved from the burden of taxation because it is practically *86 performing a public work which the State would otherwise have to perform. The nature of the relationship between the State and the holder of this type of exemption was reviewed in Carteret Academy v. State Board of Taxes and Assessment, 102 N.J.L. 525 (Sup. Ct. 1926), aff'd 104 N.J.L. 165 (E. & A. 1927):
Exemptions from the burdens of taxation, which the great masses of the people are called upon to sustain, as a requiste [sic] of civil government, are only favored in legislation, upon the theory that the concession is due as quid pro quo for the performance of a service essentially public, and which the state thereby is relieved pro tanto from the necessity of performing, such as words of charity and education, freely and charitably bestowed, as evidenced by the legislation under consideration. Without that concurring prerequisite, an exemption becomes essentially a gift of public funds at the expense of the taxpayer, and indefensible both under our public policy of equal taxation and our constitutional safeguard against illegal taxation. 2 Kent Com. 331. [102 N.J.L. at 528]
Accord: Kimberley School v. Montclair, 137 N.J.L. 402, 404 (Sup. Ct. 1948); Dwight School v. State Board of Tax Appeals, 114 N.J.L. 594, 599 (Sup. Ct. 1935), aff'd 117 N.J.L. 113 (E. & A. 1936); Catholic Charities of the Diocese of Camden v. Pleasantville, 109 N.J. Super. 475, 483 (App. Div. 1970). This rationale specifically applies to exemptions for property used for fraternal purposes, as distinguished from charitable purposes, such as that originally provided for by N.J.S.A. 54:4-3.26 as first enacted and construed in the 1930's. With respect to such statute, it was held that the exemption was valid because use of the property for fraternal purposes benefited the public generally. See Camden v. Camden Cty. Board of Taxation, supra, 121 N.J.L. at 264-265; Rutgers Chapter of Delta Upsilon v. New Brunswick, supra, 129 N.J.L. at 240.
It is apparent from the opinion in Irvis that the Supreme Court recognized the difference between the relationship arising from tax exemptions as distinguished from liquor licenses. The court was careful to note with reference to the lodge building there involved, "Nor is it located or operated *87 in such surroundings that although private in name, it discharges a function or performs a service that would otherwise in all likelihood be performed by the State." 407 U.S. at 175, 92 S.Ct. at 1972, 32 L.Ed.2d at 639. Irvis is therefore not a holding that the granting of a property tax exemption to a racially discriminatory fraternal order does not constitute prohibited state action.
This is an area in which there are strong feelings and lines are hard to draw. Forcible arguments are advanced that constitutional rights to freedom of association are ignored. There is no proof that the Rutherford Elks Lodge discriminates in the selection of the beneficiaries of such charitable works as it performs or sponsors. There is no proof at all that the State, either in the enactment or the enforcement of the exemption statute, intentionally and purposely supports racial discrimination  it simply does not inquire as to the racial policies and ideologies of those claiming exemptions. In other contexts the granting of tax exemptions has been held not to constitute prohibited state involvement or sponsorship. See Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), dealing with exemptions to religious organizations; Chicago Joint Bd. Amal. Cloth. Wkrs. v. Chicago Tribune Co., 435 F.2d 470 (7 Cir.1970), cert. den. 402 U.S. 973, 91 S.Ct. 1662, 29 L.Ed.2d 138 (1971).
But, in the last analysis, it is the Supreme Court of the United States which is the final arbiter of what constitutes state action in violation of the Fourteenth Amendment. One cannot read the opinions of the court in state action cases without being impressed with the fact that history is important and that the central purpose of the enactment of the Fourteenth Amendment goes to the heart of the decision-making process. That purpose was to eliminate all official state sources of invidious racial discrimination and it is given strong weight and favor in the balancing of constitutional rights.
*88 Considered in that light, it is apparent that the State is in the position of granting a benefit to an organization on the theory that use of its property for racially discriminatory fraternal purposes benefits the public generally, and by so doing it places its prestige behind such discrimination. A number of well-reasoned decisions, rendered both before and after Irvis, have concluded that a state significantly involves itself in invidious discriminations when it allows an exemption of this type to a fraternal order practicing racial discrimination. A three-judge court so held in Falkenstein v. Oregon Dept. of Revenue, 350 F. Supp. 887 (D. Ore. 1972), app. dism. 409 U.S. 1099, 93 S.Ct. 907, 34 L.Ed.2d 681 (1973). There the state was enjoined from granting tax exemptions from state property and corporate excise taxes to an Elks lodge because it practiced racial discrimination. The court said:
The State contends that the tax exemptions do not encourage or foster racial discrimination. They assert that the exemptions, like the liquor license in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), do not constitute state action within the meaning of the Fourteenth Amendment. We disagree.
Unlike the liquor license in Moose Lodge, tax exemptions for fraternal organizations benefit both the State and the organizations. Oregon relieves fraternal organizations from the burden of property and corporate excise taxes and in return, the public benefits from the charitable and benevolent activities of these organizations. This is the kind of "symbiotic relationship" that was lacking in Moose Lodge, supra, at 175, 92 S.Ct. 1965.
The State grants tax exemptions to encourage private support of activities in which the State has a vital interest, Methodist Book Concern v. State Tax Commissioner, 186 Or. 585, 208 P.2d 319 (1949), and to support "a service that would otherwise in all likelihood be performed by the State." Moose Lodge, supra, 407 U.S. at 175, 92 S.Ct. at 1972. The public receives services that would require the expenditure of state funds. These mutual benefits constitute a degree of state involvement in discriminatory activity that the Fourteenth Amendment prohibits. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) [350 F. Supp. at 888]
*89 See also, Pitts v. Wisconsin Dept. of Revenue, 333 F. Supp. 662 (E.D. Wis. 1971); Opinion of Attorney General for State Tax Commission, State of Idaho (Feb. 13, 1973); see McGlotten v. Connally, 338 F. Supp. 448 (D.C. 1972); Green v. Connally, 330 F. Supp. 1150 (D.C. 1971), aff'd sub nom. Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1972); Bright v. Isenbarger, 314 F. Supp. 1382 (N.D. Ind. 1970), aff'd 445 F.2d 412 (7 Cir.1971).
The exemptions for the tax years 1972 and 1973 are invalid under the Federal Constitution. They are also invalid under the State Constitution. See Washington National Ins. Co. v. Board of Review, 1 N.J. 545, 553 (1949); Andrews v. Ocean Tp. Board of Adjustment, 51 N.J. Super. 69, 72 (Law Div. 1958), aff'd 30 N.J. 245 (1959). Plaintiffs are therefore entitled to the relief sought for those years.
NOTES
[1] Separate corporations were created to own and manage the buildings beneficially owned by the Nutley and Rutherford Elks Lodges, which are unincorporated subordinate lodges of the Benevolent and Protective Order of Elks of the United States of America. See Point II, infra. The word "Lodge" appears in the official names of both the corporations and the subordinate lodges and, in general, the term "Lodge" is collectively used herein to refer to both the corporation and lodge in each municipality.
[2] I ruled that a class action was not maintainable for a number of reasons. In the first place, it was apparent that a class action would complicate matters and provide nothing that could not be furnished to plaintiffs by a ruling in a test case, and that there was good reason in the circumstances to follow Professor Chafee's admonition that "courts should be cautious in extending representative suits beyond simple situations where everybody in the class has about the same interest as everyone else. It is best for judges not to bite off more than they can chew". Chafee, Some Problems of Equity 285 (1950). In addition, it was clear that plaintiffs lacked the necessary standing for a class suit for the following reasons:

(1) Being taxpayers only of Nutley and Rutherford, they had status only to challenge exemptions granted to Elks Lodges in Essex and Bergen Counties, since it is necessary that one challenging an exemption be a taxpayer of the county where the property involved is located. See N.J.S.A. 54:3-21; Post v. Warren Point Vol., etc., Ass'n, 19 N.J. Misc. 367, 19 A.2d 636, (St. Bd. Tax App. 1941); Saddle River Tp. v. Slavonian Catholic Church, 20 N.J. Misc. 92, 24 A.2d 398, (St. Bd. Tax App. 1942); Schwartz v. Essex County Board of Taxation, 129 N.J.L. 129 (Sup. Ct. 1942), aff'd 130 N.J.L. 177 (E. & A. 1943); see Pleasantville Taxpayers v. Pleasantville, 115 N.J. Super. 85 (App. Div. 1971), aff'g 111 N.J. Super. 377 (Law Div. 1970).
(2) Wholly apart from doubts as to the extent that there could be recovery for back taxes even if past exemptions had been improperly granted, plaintiffs had status to seek back taxes only with respect to the Nutley and Rutherford Lodges since, except for governmental officials, only a taxpayer of the taxing district involved has standing to assert a right to have back taxes assessed and collected. N.J.S.A. 54:4-63.13; see Evans v. Wingert, 18 N.J. Super. 128 (Law Div. 1952); Jabert Operating Corp. v. Newark, 16 N.J. Super. 505 (App. Div. 1951).
(3) Plaintiffs had standing only to challenge the liquor licenses of the Nutley and Rutherford Lodges since, absent some special grievance, only a taxpayer of a municipality where a license is effective has a right to appeal from the granting of such license or to seek its revocation or suspension. N.J.S.A. 33:1-22, 33:1-26 and 33:1-31; Hudson-Bergen Cty. Retail Liquor Stores Ass'n v. Hoboken Bd. of Comm'rs, 134 N.J.L. 481 (Sup. Ct. 1946), rev. on other grounds, 135 N.J.L. 502 (E. & A. 1947); see Hess Oil & Chemical Corp. v. Doremus Sport Club, 80 N.J. Super. 393 (App. Div. 1963).
[3] The same applies to the tax year 1973. N.J.S.A. 54:4-4.4; Newark v. Essex Cty. Board of Taxation, 110 N.J. Super. 93, 122 (Law Div. 1970).
[4] The attorneys for the Rutherford Elks Lodge anticipated throughout the course of the litigation that the Grand Lodge might change the membership policy and that the litigation might, for all practical purposes, become moot. Reference has been made to the 1971 amendments. In July 1973 the Grand Lodge did adopt amendments which were approved by the membership in October 1973 and which changed section 4 of the constitution to delete the word "white" from the qualifications for membership but provided that "this Amendment shall be effective only until the Supreme Court of the United States shall decide that the right of the people to form associations and to determine membership qualifications shall not in any way be abridged, limited or denied or until an amendment to the Constitution of the United States shall be adopted which will guarantee that such rights shall not in any way be abridged, limited or denied. In the event of either a favorable decision of the Supreme Court of the United States or the final adoption and effectiveness of such Constitutional Amendment, this Amendment shall be null and void and of no force and effect and the language of this Section 4 of Article VII of the Constitution of the Order as the same existed before this Amendment shall be reinstated and thereupon be in full force and effect."

The effect of this amendment is not before me. It has no bearing upon the validity of the exemptions for the tax years 1972 and 1973.
[5] The Director of the Division of Alcoholic Beverage Control has ruled in cases involving the Rutherford, Red Bank and Madison Elks Lodges that, despite the racially discriminatory policies of the national and local Elks lodges, the allowance of liquor licenses to the lodges was not prohibited state action in violation of the State or Federal Constitutions. Prime reliance was placed upon the decision in the Irvis case.