Louis CORNELIUS, Jr., and all others similarly situated, Plaintiff,

v.

The BENEVOLENT PROTECTIVE OR-
DER OF the ELKS et al.,
Defendants.

Civ. No. 15150.

United States District Court,
D. Connecticut.

Aug. 2, 1974.

**1186**

Igor I. Sikorsky, Jr., Hartford, Conn., for plaintiff.

Robert K. Killian, Atty. Gen., Richard K. Greenberg, John M. Dunham, Ralph G. Murphy, Asst. Attys. Gen., Hartford, Conn., James F. Brennan, Jr., Thomas B. Wilson, New London, Conn., Raymond J. Cannon, Richard M. Sheridan, Asst. Attys. Gen., Hartford, Conn., Frederick Bernays Wiener, Washington, D. C., for defendants.

Before SMITH, Circuit Judge, and BLUMENFELD and NEWMAN, District Judges.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge:

On June 10, 1971, Henry O'Reilly, a member of Groton Lodge No. 2163 of the Benevolent Protective Order of the Elks (B.P.O.E.), filed an application for membership in the Groton Lodge on behalf of Louis Cornelius, Jr. Normally, such a solicitation of fraternal friendship would not give rise to a federal question, but the defendant Groton Elks have admitted that this particular application was not even considered because Cornelius did not meet the Elks' constitutional requirement that all members be white.[1]

Cornelius then brought suit against the Groton Elks, against the national B.P.O.E., against the Loyal Order of the Moose and against officials of the State of Connecticut. Alleging to represent all black men who would be eligible for membership in the Elks and Moose but for these organizations'[2] constitutional provisions prohibiting membership by black persons, Cornelius sought to enjoin the State's exemption of these organizations from the State's Business Corporation Tax,[3] to order the defendant State

---

1. Article VII, § 4 of the Constitution of the B.P.O.E. read in pertinent part:

 No person shall be accepted as a member of this Order unless he be a white male citizen of the United States of America, of sound mind and body, of good character, not under the age of Twenty-one years, and a believer in God.

2. Section 71.1 of the Constitution and General Laws of the Loyal Order of the Moose contained a provision similar to the Elks' bar:

 . . . The membership of lodges shall be composed of male persons of the Caucasian or White race above the age of twenty-one years, and not married to someone of any other than the Caucasian or White race, who are of good moral character, physically and mentally normal, who shall profess a belief in a Supreme Being.
 . . .

3. Section 12–214(2) of the Connecticut General Statutes:

 Every . . . company carrying on, or having the right to carry on, business in this state, including a dissolved corporation which continues to conduct business, except
 * * * * *
 (2) companies exempt by the federal corporation net income tax law, but excluding companies which elect not to be subject to such tax . . . shall pay . . . .
 Curiously, plaintiff has not challenged several other tax benefits which the defendant organizations appear to enjoy. These include exemptions from the admissions and club dues tax, Conn.Gen.Stat. § 12–541 and § 12–543, and the various federal tax provisions challenged in McGlotten v. Connally, 338 F.Supp. 448, 450, n. 3 (D.D.C.1972) (three-judge court). Interestingly, the Elks and Moose appear not to be exempt from

officials to collect back taxes not paid by virtue of that tax exemption, to enjoin the Elks and Moose from discriminating against black applicants and to collect from the clubs $11 million in compensatory and punitive damages. This relief was sought on two theories: That the Fourteenth Amendment prohibits Connecticut from granting the tax exemption to the Elks and Moose, and that 42 U.S.C. § 1981 prohibits the Elks and Moose from denying membership on the basis of an applicant's race. Defendants have moved to dismiss the complaint for failure to state a claim.

At the heart of this case is a conflict between two profound claims of right. Plaintiff contends that he has a right to be evaluated in his application for membership as a person and not as a black person. Perceiving that Cornelius is attempting to storm the citadel, the Elks and Moose stand antler to antler in asserting a constitutional right to discriminate on the basis of race with regard to their membership decisions. Plaintiff further argues not only that the State must stop assisting the defendant organizations so long as they persist in excluding blacks from membership, but also that the Elks and Moose must disgorge aid received from the State in the past. As a result, Cornelius asks this court to redistribute $11 million from the offending organizations to the class of black men he claims to represent and an indeterminate amount in tax benefits from the Elks and Moose to the State Treasury.

We freely acknowledge the moral force of plaintiff's first argument; racial prejudice, reprehensible enough when exhibited by an individual, is all the more evil in institutional form. The notion of reparative redistribution also has its moral claims, *cf.*, Bittker, The

Case for Black Reparations, at 8–29 (1973), although they would be stronger if asserted against an institution which was more central to the plight of the black population than the Elks and Moose. But while it is true that "[t]he scope of legal duty has expanded in obedience to the urge of morals," Justice Cardozo, The Paradoxes of Legal Science at 46 (1928), "[t]he law does not compel active benevolence between man and man. It is left to one's conscience whether he shall be the good Samaritan or not." Ames, Law and Morals, 22 Harv.L.Rev. 97, 112 (1908). We sit in legal, not moral judgment. *Cf.* Shoshone Indians v. United States, 324 U.S. 335, 355, 65 S.Ct. 690, 89 L.Ed. 985 (1945) (Justice Jackson, concurring). The problem before us is the extent to which these moral claims translate into legal rights.

### A. Tax Exemption

■ We have concluded that the tax exemption claim lodged by plaintiff is not one upon which relief may be granted and must be dismissed. We hasten to add that dismissal is not premised on a failure to state a cause of action against the State defendants. On the facts as alleged in the complaint, there is presented a close and complex question whether plaintiff's constitutional right to the equal protection of the laws has been infringed by the challenged tax exemption. However, changes in the facts of the case which have occurred subsequent to the filing of the complaint have rendered moot plaintiff's claim for an injunction against the continuation of the tax exemption, and well-established principles of equity do not permit the granting of the injunctive relief which is the only conceivable remedy for whatever constitutional wrong may have in-

the Connecticut property tax because in Masonic Building Ass'n v. Stamford, 119 Conn. 53, 174 A. 301 (1934), the Connecticut Supreme Court, in an opinion by Chief Justice Maltbie, interpreted the exemption provision, Conn.Gen.Stat. § 12–81(7), as not applying to fraternal organizations:

An organization which meets in secret, membership in which is dependent in part at least on social considerations, and the ends of which are in part at least of a social nature, would not conform to these standards [e. g., devotion to public use]. 119 Conn. at 61, 174 A. at 304.

hered in the past granting of that tax exemption.

Nonetheless, a short discussion of the merits of the case will be useful. This will serve to clarify the reasons why we have concluded that the relief sought cannot be granted and will provide needed guidance to the parties. The application of constitutional law to taxation and tax exemptions is a recent development,[4] and one which has been criticized by the commentators as being unprincipled. *Cf.*, Bittker and Kaufman, 'Constitutionalizing' the Internal Revenue Code: Taxes and Civil Rights, 82 Yale L.J. 51 (1972).

This is not a conventional "state action" case, in which the discrimination practiced by the ostensibly private entity is alleged to be "state action," the question is whether private conduct which is in some manner assisted by the actions of the state is "state action" for the purposes of the Fourteenth Amendment, and the remedy sought is the termination of the entity's discrimination. *See, e. g.,* Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). The discrimination practiced by the Elks and the Moose is not alleged to be "state action," nor are the clubs themselves alleged to be agents of the state chargeable with the state's duty to refrain from racial discrimination. Insofar as his tax exemption challenge is concerned, the plaintiff does not seek to stop the discrimination of the private clubs. The plaintiff is asserting rights against the state, not against the Elks and the Moose. The plaintiff is suing state officials to stop them from administering a state statute in a way that he contends denies him, as a black person,[5] the equal protection of the laws by assisting discriminatory private conduct. The plaintiff seeks only to stop the granting of the tax exemption and to have collected the taxes which would have been collected from the Elks and the Moose but for the exemption. Thus the challenged action is clearly governmental, or "state action": That state aid, embodied in state legislation authorizing tax exemption, is "state action" is a proposition to which all can subscribe. Jackson v. Statler Foundation, 496 F.2d 623, 636, (2d Cir. 1974) (Friendly, J., dissenting from denial of *en banc* consideration).

The real question here is not whether the tax exemption is state action but rather whether it is "unconstitutional state action," because the tax exemption leads to "significant state involvement in private discriminations." Reitman v. Mulkey, 387 U.S. 369, 375, 87 S.Ct. 1627, 1631, 18 L.Ed.2d 830 (1967). The question whether state legislation serves to "encourage and significantly involve the State in private racial discrimination contrary to the Fourteenth Amendment" was recognized in *Reitman* as defying

4. Plaintiff relies on several very recent cases which have either invalidated or suggested the invalidity of the provision of federal or state tax benefits to racially discriminatory fraternal organizations. Brunson v. Rutherford Lodge No. 547, 128 N.J.Super. 66, 319 A.2d 80 (1974) ; Falkenstein v. Dept. of Revenue, 350 F.Supp. 887 (D.Or.1972) (three-judge court), appeal dismissed, 409 U.S. 1099, 93 S.Ct. 907, 34 L.Ed.2d 681 (1973) ; McGlotten v. Connally, 338 F.Supp. 448 (D.D. C.1972) (three-judge court) ; Pitts v. Dept. of Revenue, 333 F.Supp. 662 (E.D.Wis.1971) (three-judge court). Defendants, in denying the existence of any "state action" as well as in contending that no such action violates the Fourteenth Amendment, rely on the holdings in Walz v. Tax Commission, 397 U. S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), that the grant of a tax exemption to a religious body did not violate the First Amendment, and in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed. 2d 627 (1973), that a State liquor license did not constitute "state action" in violation of the Fourteenth Amendment. *See generally,* Jackson v. Statler Foundation, 496 F.2d 623 (2d Cir. 1974).

5. Cornelius, as a black person, has standing to challenge the constitutionality of the tax exemption as applied to the Elks and Moose. Data Processing Service v. Camp, 397 U.S. 150, 153–154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) ; *Jackson, supra,* 496 F.2d at 627 ; *McGlotten, supra,* 338 F.Supp. at 452 ; *Pitts, supra,* 333 F.Supp. at 669–670 ; *Falkenstein, supra,* 350 F.Supp. at 888.

resolution by "an infallible test" and requiring instead a process of " 'sifting facts and weighing circumstances' on a case-by-case basis." 387 U.S. at 376, 378, 87 S.Ct. at 1632, 1633. More recently, the Supreme Court has stated in the context of a state program to lend textbooks to students at both public and private schools irrespective of the schools' racial policies:

> [T]he Constitution does not permit the State to aid discrimination even when there is no precise causal relationship between state financial aid to a private school and the continued well-being of that school. A State may not grant the type of tangible financial aid here involved if that aid has a significant tendency to facilitate, reinforce, and support private discrimination. "[D]ecisions on the constitutionality of state involvement in private discrimination do not turn on whether the state aid adds up to 51 per cent or adds up to only 49 per cent of the support of the segregated institution." Poindexter v. Louisiana Financial Assistance Comm'n, 275 F. Supp. 833, 854 (E.D.La.1967).

Norwood v. Harrison, 413 U.S. 455, 466, 93 S.Ct. 2804, 2811, 37 L.Ed.2d 723 (1973).[6]

Different factors may bear upon analysis of (1) whether an aggrieved person has demonstrated that some form of state assistance has led to significant state involvement in and "encouragement" of the private discrimination engaged in by the state-assisted entity, and therefore that the assistance must stop, as opposed to (2) whether an aggrieved person has demonstrated that the entity is so entwined with the state as to have become a state agent and therefore that the discriminatory activity itself must stop. The latter issue requires consideration of all of the variables that bear on the traditional inquiry into the existence of "state action." But the former "encouragement" issue—the one presented by the plaintiff's challenge to the defendant state officials' application of § 12–214(2) of the Connecticut General Statutes, see note 3, supra—may well succeed upon a showing of less state involvement than would be required to constitute the state-assisted entity as an agent of the state and hence itself directly subject to Fourteenth Amendment limitations.[7] It is one thing to sue on Fourteenth Amendment grounds to halt state assistance to an otherwise private entity; it is quite another to seek on those grounds to re-

6. Two other recent Supreme Court cases which would appear to be on point have failed to clarify the factors bearing on whether state assistance to discriminatory private entities is so significant as to constitute unconstitutional "encouragement." Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), is an Establishment Clause case, and decisions reconciling the unique tensions of the Religious Clauses do not bind courts working in the context of the Equal Protection Clause. Pitts v. Dept. of Revenue, 333 F.Supp. 662, 667–669 (E.D.Wis.1971) (three-judge court). Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1973), considered only the question of the consequences of the grant of a liquor license to a private club. Examination of the briefs submitted to the Court in that case reveals that the Court was not informed of the existence, if any, of state or federal tax assistance to the club. Because "encouragement" is a concept which requires close attention to the particular facts and circumstances of a case,

we are not bound by a decision which did not confront the crucial fact in this case— exemption from the State's Business Corporation Tax. Cf., Gilmore v. City of Montgomery, 417 U.S. 556, 573–575, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974).

7. In Jackson, the court identified five factors which are particularly important in deciding whether private conduct which is aided by the state is "state action":
(1) the degree to which the "private" organization is dependent on governmental aid; (2) the extent and intrusiveness of the governmental regulatory scheme; (3) whether that scheme connotes government approval of the activity or whether the assistance is merely provided to all without such connotation; (4) the extent to which the organization serves a public function or acts as a surrogate for the State; (5) whether the organization has legitimate claims to recognition as a "private" organization in associational or other constitutional terms.

strain the entity in its own conduct.[8] If the latter suit is successful, the entity may have no choice but to alter its practices; if the former suit is successful,

Each of these factors is material; no one factor is conclusive.

496 F.2d at 629.

In deciding whether action which is clearly "state action" constitutes unconstitutional "encouragement" of private discrimination, only three of the five *Jackson* variables are relevant: (1) degree of dependence on state aid; (3) connotation of government approval; (5) claim to constitutional protection. Moreover, the two types of lawsuits (one directly challenging the "private" conduct and seeking to halt it or to recover damages arising from it, the other challenging only the state assistance to that "private" conduct and seeking to halt that assistance) have different impacts on the conduct in question, and the third variable here, (5) claim to constitutional protection, must be adjusted to reflect this difference. A legitimate claim that private discriminatory conduct is constitutionally protected necessarily conflicts with the no less legitimate claim that the state is constitutionally prohibited from acting discriminatorily or encouraging private parties to engage in discrimination. In balancing these claims, the weight to be accorded the claim of private conduct to constitutional protection is directly linked to the impact on that conduct should the constitutional balance be held to favor the countervailing claim that the state is prohibited from engaging in or encouraging discrimination. An action which seeks to enjoin arguably protected conduct or to exact damages arising from that conduct clearly threatens the continued existence of the conduct. One which seeks only to halt state aid to arguably protected conduct will have a "chilling effect" on the exercise of the alleged rights, *cf.*, Speiser v. Randall, 357 U.S. 513, 78 S. Ct. 1332, 2 L.Ed.2d 1460 (1958) (refusal to grant tax exemption to veteran otherwise eligible but unwilling to take loyalty oath held to be an invalid limitation on First Amendment rights); Gilmore v. City of Montgomery, 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed. 2d 304 (1974) (suggestion that court-ordered exclusion of discriminatory groups from public facilities raises problem of freedom of association); Bruns v. Pomerleau, 319 F.Supp. 58 (D.Md.1970) (refusal to hire member of nudist club as policeman held to have impermissible chilling effect on nudist's rights), but the arguably protected conduct may well continue in the absence of that aid. Thus in the "state action" context, where resolution of the balancing process against a claim of constitutional protection will effectually end that conduct, a showing that the private conduct alleged to be "state action" derives protection from the general ambit of a liberally construed constitutional guarantee may well suffice to defeat the plaintiff's effort to classify the challenged conduct as "state action." On the other hand, where the question is whether governmental action which is clearly state action constitutes unconstitutional "encouragement" and thus where success on the merits will impede but not forbid the private conduct, only a showing that the private conduct is protected by a core value of the Constitution, entitled to the most vigilant and vigorous protection against official encroachment, should tip the balance against honoring, through withdrawal of the challenged "encouragement," the constitutional mandate against state promotion of racial discrimination.

8. It should be noted that suits aimed directly at stopping allegedly objectionable conduct by ostensibly private entities have appeared to present courts with the bleak alternative of either finding "state action," with its drastic impact on every aspect of the entities' operations, or finding no "state action," thus allowing entities subject to no public accountability for their conduct to continue to receive public assistance so long as that assistance, however substantial, does not reach the critical mass which transforms the entity into an agent of the state. Our society has always placed a high value on privacy and private enterprise, but the increasing involvement of the state in all aspects of life and culture is a concomitant of the modern industrial state. This pervasive involvement threatens traditional values of decentralization, self-reliance, private endeavor, and personal association. Justifiable solicitude for preserving a private sector in our national political and social economy may well inhibit courts in finding ostensibly private conduct to be in fact "state action" and so subject to constitutionally required limitations. *See, e. g.*, Wahba v. New York University, 492 F.2d 96, 101–103 (2d Cir. 1974). Suits to stop state "encouragement" of private conduct subversive of Fourteenth Amendment values, without seeking to establish that conduct as "state action," offer a means of insuring that private conduct inconsistent with public policies, while free to continue, will not continue to receive public subsidy. Since the result of the successful prosecution of such an "encouragement" suit is less drastic than the result of a "state action" suit, courts might well prove more willing to monitor the uses to which public resources are put when in private hands under the rubric of preventing state "encouragement" of conduct in

the entity can choose between continuing to practice racial discrimination at the cost of forfeiting further state assistance, or abandoning its discriminatory practices and policies so that the state might constitutionally continue its assistance.[9]

Whatever combination of factors is appropriate for consideration when state assistance to an entity is attacked rather than the actions of the entity itself, definitive delineation of these factors and their application to this case is no longer necessary.

## Mootness of Current Exemption Claim

On May 28, 1973, the International Convention of the Loyal Order of the Moose amended the constitution and general laws of the order, eliminating their racial bar. On July 19, 1973, the Convention of the Grand Lodge of the B.P.O.E. approved a proposed amendment to the B.P.O.E. constitution, and on October 18, 1973, after ratification by a majority of the membership of the subordinate lodges,[10] Article VII, § 4 of

the constitution was changed to delete the word "white."[11]

Plaintiff contends nevertheless that the Elk's constitution continues a policy of racial discrimination, in that a proviso in their amendment states that the amendment shall be effective only until the Supreme Court recognizes "that the right of the people to form associations and to determine membership qualifications shall not in any way be abridged, limited or denied." This amendment was a response to the decision in McGlotten v. Connally, 338 F.Supp. 448 (D.D.C.1972) (three-judge court), which in denying those defendants' motion to dismiss threatened the existence of the Elks' federal tax benefits. Thus, it is clear that the proviso would only be triggered by a Supreme Court decision which recognized not only a right to discriminate in selecting members but also a right to continue receiving tax benefits while so discriminating.

The fact remains that there is now no color bar in the defendant clubs' constitutions or by-laws. Moreover, "there is no reasonable expectation that . . .

which the state itself could not engage, than under the rubric of "state action," in which the court is forced to look at the challenged private conduct as if it were the conduct of the state itself.

9. If an entity's actions were found to constitute "state action," a court could enjoin its discriminatory actions. While it is possible that the entity could at that point relinquish the assistance it obtains from the state, this action would not necessarily support an application for a lifting of the injunction, on the ground that the entity's actions were no longer "state action." It may be that the entity would continue to be so entwined with the state, even after it relinquished the assistance, as to continue to be an agent of the state: Financial dependence is only one of the five *Jackson* variables; the presence of the other four may well be sufficient to make the entity's action "state action." Also, the threat of damage actions under 42 U.S.C. § 1983 might in itself be coercive enough to force an entity to alter its practices, lest its disentanglement from the state be held to be inadequate to remove its "state action" status and its consequent exposure to suits for damages.

10. The vote was 1,184,675 for adoption and 309,280 against. Letter from Mr. Homer Huhn, Jr., Grand Secretary, B.P.O.E.

11. Section 4 now reads:

Membership in the Order is limited to male citizens of the United States of America not under twenty-one years of age, and having such other qualifications as may be provided by Statute, provided, however, that this Amendment shall be effective only until the Supreme Court of the United States shall decide that the right of the people to form associations and to determine membership qualifications shall not in any way be abridged, limited or denied or until an amendment to the Constitution of the United States shall be adopted which will guarantee that such rights shall not in any way be abridged, limited or denied, in the event of either a favorable decision of the Supreme Court of the United States or the final adoption and effectiveness of such Constitutional Amendment, this Amendment shall be null and void and of no force and effect and the language of this Section 4 of Article VII of the Constitution of the Order as the same existed before this Amendment shall be reinstated and thereupon be in full force and effect.

[this] wrong will be repeated," United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953), for if the proviso is triggered by a Court decision as described then the alleged "wrong" will become a "right."

Of course, the fact that the Elks and Moose have ended their history of *"de jure"* discrimination does not necessarily mean that they will not merely commence more subtle *"de facto"* discrimination. If there were a showing of *de facto* discrimination, plaintiff's claim would not be moot because "state action" which thoughtlessly promotes discrimination ". . . can be as disastrous and unfair to private rights and the public interest as the perversity of a willful scheme." Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920, 931 (2d Cir. 1968).[12] But plaintiff has not suggested that there is continuing *de facto* discrimination and, indeed, he disavowed any intention of challenging *de facto* discrimination.

Given this posture, we must conclude that plaintiff's action to enjoin the defendant State officials from continuing the defendant organizations' exemption is moot. There is simply no unresolved allegation before us of continuing racial discrimination on the part of the Elks or Moose.

*Past Exemption Not a Proper Basis for Relief*

■ Plaintiff's action to compel the State officials to collect back taxes not paid by the Elks and Moose by virtue of the challenged exemption is not moot. This cause of action focuses on State aid which was given during a period [13] when these organizations had an admitted color bar in their constitutions. Yet even if we were to proceed to the merits of this question and to decide that this past exemption was unconstitutional, we would have to deny the extraordinary remedy plaintiff requests.

Plaintiff in effect asks that we apply retroactively the constitutional prescription he seeks. In Lemon v. Kurtzman, *Lemon III*, 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973), the Court made it clear that "problem[s] arising from enforcement of a state statute during the period before it ha[s] been declared unconstitutional," 411 U.S. at 199, 93 S. Ct. at 1469, are subject to general principles of equitable relief:

> [I]n constitutional adjudication as elsewhere, equitable remedies are a special blend of what is necessary, what is fair, and what is workable. "Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling pub-

---

12. While the existence of *de facto* discrimination would save the claim from mootness, it might alter our consideration of the issue of "encouragement." Whether the "state action" was willful or accidental does not, of course, affect the degree of an organization's dependence on that action. However, it might be said to affect whether or not there was any connotation of governmental approval: If the discrimination is *de jure*, the state clearly is more chargeable with knowledge that its assistance is being used for discriminatory purposes. However, the focus of "connotation of approval" is not solely the state of mind of state tax officials, but also, and perhaps more importantly, the state of mind of the general citizenry. If the latter recognize that, pursuant to some conscious scheme of governmental assistance,

the State is assisting an activity which the citizenry but not the state know to be discriminatory, then there might well be "connotation of approval" in the air.

13. Plaintiff cannot, of course, seek to disgorge all tax benefits *ever* enjoyed by the defendant organizations. The statute of limitations provides a brake on the applicability of his argument. Because 42 U.S.C. § 1983, pursuant to which plaintiff sues on this count, does not contain a statute of limitations, we must look to the State law. Swan v. Board of Higher Education of City of New York, 319 F.2d 56, 59 (2d Cir. 1963). There is a three-year limitations period with respect to the challenged Corporation Business Tax.Conn.Gen.Stat. § 12–233.

lic and private needs." Brown v. Board of Education, 349 U.S. 294, 300 [75 S.Ct. 753, 756, 99 L.Ed. 1083] (1955). Mr. Justice Douglas, speaking for the Court, has said,

> "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." Hecht Co. v. Bowles, 321 U.S. 321, 329–330 [64 S.Ct. 587, 592, 88 L.Ed. 754] (1944).

See also Holmberg v. Armbrecht, 327 U.S. 392, 396 [66 S.Ct. 582, 584, 90 L.Ed. 743] (1946).

In equity, as nowhere else, courts eschew rigid absolutes and look to the practical realities and necessities inescapably involved in reconciling competing interests, notwithstanding that those interests have constitutional roots.

*See also* Gilmore v. City of Montgomery, 417 U.S. 556, 570, n. 10, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974). A combination of several factors convinces us that the relief plaintiff seeks is inappropriate.

 First, considerations of federalism counsel against injunctive interference in the executive processes of state government save when absolutely essential to preserve federally guaranteed rights.[14] "Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies . . . . [Under] a doctrine of abstention appropriate to our federal system . . . the federal courts, 'exercising a wise discretion,' restrain their authority because of 'scrupulous regard for the rightful independence of the state governments' and for the smooth working of the federal judiciary." Railroad Commission v. Pullman Co., 312 U. S. 496, 500–501, 61 S.Ct. 643, 645, 85 L. Ed. 971 (1941). *Cf.,* Younger v. Harris, 401 U.S. 37, 43–45, 91 S.Ct. 746, 27 L. Ed.2d 669 (1971). The federal policy against judicial interference with state governmental functions is especially strong with reference to taxation. Congress has specifically withdrawn the federal courts' jurisdiction to "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law" where state courts provide "a plain, speedy and efficient remedy." 28 U.S.C. § 1341. Moreover, where such a state remedy is available the Supreme Court has directed federal chancellors to refrain from issuing declaratory judgments on the validity of state taxes. Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 297–302, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943).

 While section 1341 and its correlative judge-made law do not control the issue at hand, since they relate to judgments inhibiting rather than compelling the collection of taxes,[15] they

---

14. Of the three federal courts and one state court which have invalidated or suggested the invalidity of tax benefits to racially discriminatory fraternal organizations, *supra*, n. 4, only the state court has contemplated ordering the collection of back taxes, *see* Brunson v. Rutherford Lodge No. 547, 128 N.J.Super. 66, 319 A.2d 80 at 83, n. 2, 85–86 (1974), and even that court ultimately issued only a declaratory decree. *Id.* at 93. Significantly, the Borough of Rutherford has in light of *Brunson* undertaken to collect the back taxes there in issue, without having been placed under any judicial compulsion to do so. Telephone interview with Mrs. L.

Walsh, Assessing Clerk, Office of Mr. Edward McLaughlin, Assessor, Borough of Rutherford, Bergen County, New Jersey, July 24, 1974. Of course, nothing in our opinion herein prevents officials of the State of Connecticut from reviewing the legality of the defendant clubs' past tax exemptions and, should these officials deem it justified, from moving under State law to collect taxes which they conclude should in the past have been paid by the defendant clubs.

15. The legislative history of § 1341 indicates that Congress' concern was the withholding of tax revenues pending litigation during the

certainly suggest that a mandatory injunction requiring the collection of back taxes ought not to be granted as a matter of course simply upon a showing that state tax laws have in the past been applied unconstitutionally.[16] It should be noted that there has been no hint in this case of bad faith on the part of the defendant State officials in the granting of the exemption to the defendant clubs. Were bad faith present, the injunctive relief sought might well be appropriate. *Cf.*, State of Alabama v. United States, 304 F.2d 583 (5th Cir.), aff'd, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962).

 Absent some element of bad faith in their administration of State tax laws, the defendant State officials are clearly not liable in damages to the plaintiff,[17] and this circumstance presents a second ground for withholding injunctive relief. As the Supreme Court has stated in the context of an anti-trust action:

The sole function of an action for injunction is to forestall future violations. It is so unrelated to punishment or reparations for those past that its pendency or decision does not prevent concurrent or later remedy for past violations by indictment or action for damages by those injured.

All it takes to make the cause of action for relief by injunction is a real threat of future violation or a contemporary violation of a nature likely to continue or recur. This established, it adds nothing that the calendar of years gone by might have been filled with transgressions. Even where relief is mandatory in form, it is to undo existing conditions, because otherwise they are likely to continue.

United States v. Oregon State Medical Society, 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952). Where the recovery of damages is authorized, mandatory injunctive relief may be properly employed to the same ends as damages if the injunction will better provide the complete relief to which the prevailing party is entitled. *See,* State of Alabama, *supra.* But where complete relief is not the right of plaintiff, federal chancellors must be chary of using injunctive relief as a surrogate for otherwise unauthorized damages, *cf.,* Edelman v. Jordan, 415 U.S. 651, 667–669, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), especially when the real targets of the plaintiff's efforts to exact *de facto* damages are third parties to the plaintiff's claim against the defendant State officials.

The fact that the injunctive relief sought would have the same adverse fi-

---

desperate days of the Depression. S.Rep. No.1035, 75th Cong., 1st Sess. (1937). Here, of course, the State can only benefit if its tax officials are compelled to collect back taxes from the defendant organizations.

Moreover, § 1341 may also be inapplicable by its terms in that the plaintiff, who is obviously a third party to the taxing relationship between the organizations and the State, may lack standing—and hence a "plain, speedy and efficient" remedy—under Connecticut law. *See,* Gannon v. Sanders, 157 Conn. 1, 6, 244 A.2d 397 (1968); Coyle v. Housing Authority, 151 Conn. 421, 424, 198 A.2d 709 (1964); Benson v. Housing Authority, 145 Conn. 196, 204, 140 A.2d 320 (1958).

16. The defendant State officials would not be under any ministerial duty to collect back taxes upon an adjudication that the Elks and the Moose had unconstitutionally been granted a tax exemption. The discretionary nature of their decision whether unpaid Con-

necticut Corporation Business taxes should in such a circumstance be collected appears not only from the non-mandatory word "may" as used in several statutes concerning assessment and collection of the Corporation Business Tax, *see,* e. g., Conn.Gen.Stat. §§ 12–35, 12–229, and 12–235, but also from Conn.Gen.Stat. § 12–236, which provides that upon a taxpayer's appeal from an assessment of back taxes the tax commissioner may make such order "as appears to him just and lawful."

17. The defendant State officials enjoy a qualified immunity which is not placed in issue in the absence of an allegation of bad faith on their part. *See,* Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). And of course, the State itself is immune from a suit for damages under the Eleventh Amendment. *See,* Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

nancial effect on the Elks and the Moose as would a judgment against them for damages presents a third ground for our reluctance to grant the requested injunction: The Elks and Moose, whose coffers plaintiff seeks to raid, have some claim to constitutional protection of their actions. In Evans v. Newton, 382 U.S. 296, 298, 86 S.Ct. 486, 488, 15 L. Ed.2d 373 (1966), the Court recognized ". . . the right of the individual to pick his own associates so as to express his preferences and dislikes, and to fashion his private life by joining such clubs and groups as he chooses." In Bell v. Maryland, 378 U.S. 226, 313, 84 S.Ct. 1814, 1862, 12 L.Ed.2d 822 (1964) (Justice Goldberg, concurring), three justices agreed that ". . . it is the constitutional right of every person to close his home or club to any person or to choose his social intimates and business partners solely on the basis of personal prejudices including race." And in *Moose Lodge*, 407 U.S. at 179–180, 92 S.Ct. at 1974, Justice Douglas stated:

> The associational rights which our system honors permit all white, all black, all brown, and all yellow clubs to be formed. They also permit all Catholic, all Jewish, or all agnostic clubs to be established. Government may not tell a man or woman who his or her associates must be. The individual can be as selective as he desires. So the fact that the Moose Lodge allows only Caucasians to join or come as guests is constitutionally irrelevant, as is the decision of the Black Muslims to admit to their services only members of their race.[18]

Whether analyzed in terms of a "right to associate" or a "right to privacy,"[19] such authority supports the clubs' view that they cannot be required not to discriminate with respect to their membership. Of course, there is no constitutional right to receive state aid while engaging in such discrimination. But plaintiff's position, which would strip the defendant organizations of state assistance, would penalize the Elks and Moose because of an exercise of what they claim, with some substance, to be their constitutional rights. This result is permissible only if the defendant clubs' claim to associational freedom is outweighed by plaintiff's claim to equal protection of the laws, including tax laws.[20]

In balancing the constitutional proscription of state encouragement of racial discrimination against the state's constitutional obligation to avoid penalizing the exercise of constitutional rights, it is important to note that the associational activities of the Elks and Moose are purely social and not political[21] and therefore do not come within the core protection of the right to associate. *Cf.*, Note, Private Club Discrimination, 1970 Wisconsin L. Rev. 595, 601; Sigma Chi Fraternity v. Regents of the University of Colorado, 258 F.Supp. 515, 523–526 (D.Colo.1966) (three-judge court). *Contrast*, Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958). Again, while there are important privacy interests at stake here, the clubhouse is of course not on the same constitutional plane as is the bedroom or study with respect to

---

18. Although Justice Douglas spoke in dissent, the *Moose Lodge* majority did not seem to disagree with this statement. Their conclusion was,

> In short, while Eagle [the restaurant in Burton v. Wilmington Parking Authority, 365 U.S. 715 [81 S.Ct. 856, 6 L.Ed.2d 45] (1961)] was a public restaurant in a public building, Moose Lodge is a private social club in a private building.

407 U.S. at 175, 92 S.Ct. at 1972. Moreover, this portion of the dissent may now be

deemed to represent the view of the majority of the present Court following its quotation with express approval in Gilmore v. City of Montgomery, 417 U.S. 556, 575, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974).

19. *See*, text at 1202, 1203, *infra*.

20. *See*, n. 7, *supra*.

21. Section 4(e) of the House Rules of Groton Lodge provides:

> Political and religious arguments will not be permitted.

the right to privacy. *Cf.*, Griswold v. Connecticut, 381 U.S. 479, 495, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (Justice Goldberg, concurring); Stanley v. Georgia, 394 U.S. 557, 565, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

██ On balance, it might be that the defendant organizations' constitutional claims are insufficient to outweigh the necessity of terminating state encouragement of their discriminatory activities. But in deciding whether to impose on these clubs the burden of retroactive tax payments, those constitutional claims stand on a somewhat different footing. First, there is less of a compulsion to withdraw the aid retroactively than purely prospectively: Prospective relief is sufficient to expunge any connotation of state approval of the discrimination. Secondly, because the past tax exemptions are assumed to have had a significant fiscal effect in encouraging the discriminatory conduct, their retroactive revocation will necessarily jeopardize the continued existence of the clubs. But conduct engaged in under a substantial claim of constitutional right should not incur such a harsh sanction. If it were to become expected that conduct close to the border of constitutional protection would result, upon litigation, in retroactive penalization for what are subsequently determined to have been acts beyond the pale, then few would dare explore territory at the edge of the constitutional map. Constitutionally protected ground might be little trod if minefields await whoever steps over the unmarked line of legality.

Finally, the parties who would be injured by the relief sought, the Elks and Moose, have demonstrated good faith during the course of this litigation. By amending their constitutions, they have conformed their behavior, at least facially, to plaintiff's demand. If and when it is established that the defendant organizations are continuing to discriminate, it may be necessary to reconsider this conclusion.

**B. Discrimination in Membership**

██ Cornelius argues that 42 U. S.C. § 1981 prohibits the defendant clubs from discriminating racially with respect to their membership practices. This claim is not moot, for it concerns a past act of discrimination. Nor, as an action at law for damages, does it raise problems of the propriety of equitable relief. Plaintiff, however, has standing to sue only the Elks, for he never applied to the Moose. *Moose Lodge,* 407 U.S. at 165–171, 92 S.Ct. 1965. Similarly, plaintiff's class action allegation is defective. He seeks to represent all black persons otherwise eligible for membership, but only those who have in fact applied for membership and have been turned away have been legally aggrieved with respect to this cause of action.

██ With regard to jurisdiction, the section 1981 claim by itself does not require the services of a three-judge court. Mindful, however, that the issues of fact it raises "are so interrelated to the three-judge questions as to present one continuous transaction or set of operative facts," Jenkins v. McKeithen, 286 F.Supp. 537, 542 (E.D.La.1968) (three-judge court), rev'd on other grounds, 395 U.S. 411, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969), and after due consideration of the interest of judicial economy, we choose to reach the pendent statutory claim. Haining v. Roberts, 453 F.2d 1223, 1224, n. 1. (5th Cir. 1971).

*Plaintiff's § 1981 Theory*

Section 1981 reads:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, tax-

es, licenses, and exactions of every kind, and to no other.

This statute was first enacted as part of Section 1 of the Civil Rights Act of 1866.[22] Congress passed this Act pursuant to Section 2 of the Thirteenth Amendment,[23] its purpose being "the obliteration and prevention of slavery with all its badges and incidents," Civil Rights Cases, 109 U.S. 3, 21, 3 S.Ct. 18, 28, 27 L.Ed. 835 (1883). Section 1 of the 1866 Act also embodied the present 42 U.S.C. § 1982.[24]

The Supreme Court initially interpreted the 1866 Act as being inapplicable to purely private acts of discrimination. Civil Rights Cases, 109 U.S. at 17–18, 3 S.Ct. 18; Corrigan v. Buckley, 271 U.S. 323, 46 S.Ct. 521, 70 L.Ed. 969 (1926); Hurd v. Hodge, 334 U.S. 24, 31, 68 S.Ct. 847, 92 L.Ed. 1187 (1948). But in Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968), the Court held that section 1982 applied to a private sale of property. The Court found that Congress was empowered under Section 2 of the Thirteenth Amendment to determine what "badges

and incidents of slavery" are and to legislate against them. The Court further found that the Congressional finding, in section 1982, that private discrimination in real estate transactions was such an incident of slavery was not irrational and therefore was valid.

■ Lower federal courts have applied the reasoning in *Jones* to hold that section 1981 applies to purely private acts of racial discrimination. Macklin v. Spector Freight Systems, Inc., 156 U.S. App.D.C. 69, 478 F.2d 979 (1973); Payne v. Ford Motor Co., 461 F.2d 1107 (8th Cir. 1972); Brown v. Gaston County Dyeing Machine Co., 457 F.2d 1377 (4th Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972); Young v. ITT, 438 F.2d 757 (3d Cir. 1971); Boudreaux v. Baton Rouge Marine Contracting Co., 437 F.2d 1011 (5th Cir. 1971); Waters v. Wisconsin Steel Workers of International Harvester Co., 427 F.2d 476 (7th Cir.), cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970). Although there is some minor divergence between the legislative histories of the two sections,[25] the com-

---

22. Section 1 of the Civil Rights Act of 1866 read:

> That all persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right, in every State and Territory in the United States, to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding.

23. Section 2 of the Thirteenth Amendment reads:

> Congress shall have power to enforce this article by appropriate legislation.

24. 42 U.S.C. § 1982 reads:

> All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

25. Congress reenacted the Civil Rights Act of 1866 in the Enforcement Act of 1870, modifying the language of what is now section 1981 by extending its protection to all persons within the United States rather than to citizens alone, but not disturbing the language of the present section 1982. It has been argued that this indicates that Congress intended that section 1981 be a means of enforcing the Fourteenth and not the Thirteenth Amendment. This theory appears to have had some initial success, Hurd v. Hodge, 334 U.S. 24, 30–31, n. 7, 68 S.Ct. 847, 92 L.Ed. 1187 (1948); United States v. Wong Kim Ark, 169 U.S. 649, 695–698, 18 S.Ct. 456, 42 L.Ed. 890 (1898), but it is now recognized as being unpersuasive. *Jones, supra,* 392 U.S. at 436, 437, 441–443, n. 78, 88 S.Ct. 2186; *Waters, supra,* 427 F.2d at 482. The legislative history demonstrates no clear intention to make such a fundamental change.

mon roots of the two statutes compel a common reading.

Not only must we read section 1981 to cover private acts of discrimination, we must also follow the *Jones* Court's admonition that the 1866 Act's derivative statutes be "accord[ed] . . . a sweep as broad as . . . [their] language." *Jones, supra,* at 437, 88 S. Ct. at 2202. Remembering that the object of the Thirteenth Amendment was the "obliteration and prevention of slavery with all its badges and incidents," *Civil Rights Cases, supra,* we must approach section 1981 with a respect for the "broad and sweeping nature of the protection meant to be afforded." Sullivan v. Little Hunting Park, 396 U.S. 229, 237, 90 S.Ct. 400, 404, 24 L.Ed.2d 386 (1969).

Section 1981 applies on its face to all discriminatory contracts. Plaintiff points out that application to and membership in a fraternal organization is a contractual relationship under Connecticut law. *See, e. g.,* N. E. O. P. v. Hine, 82 Conn. 315, 317, 73 A. 791 (1909); Supreme Council of the Royal Arcanum v. Green, 237 U.S. 531, 35 S.Ct. 724, 59 L.Ed. 1089 (1915). He argues that since the Groton Elks refused to contract with him because of his race, he has a cause of action under section 1981.

While section 1981 has been applied primarily to employment contracts, several decisions have held it to prohibit discrimination in other types of contractual relationships. Olzman v. Lake Hills Swim Club, 495 F.2d 1333 (2d Cir. 1974) and Scott v. Young, 421 F.2d 143 (4th Cir. 1970), cert. denied, 398 U.S. 929, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970) (recreational facilities); Cook v. Advertiser Co., 458 F.2d 1119 (5th Cir. 1972) (no contract found to exist between newlyweds and newspaper with respect to society page announcement); Gonzales v. Fairfax-Brewster School, Inc., 363 F. Supp. 1200 (E.D.Va.1973) (private school); Sims v. Order of United Commercial Travelers, 343 F.Supp. 112 (D.Mass.1972) (insurance); Grier v.

Specialized Skills, Inc., 326 F.Supp. 856 (W.D.N.C.1971) (educational services with barber school); James v. Ogilvie, 310 F.Supp. 661 (N.D.Ill.1970) and Dobbins v. Local 212, Int'l Bhd. Electrical Workers, 292 F.Supp. 413 (S.D.Ohio 1968) (membership in labor unions); United States v. Medical Society, 298 F.Supp. 145 (D.S.C.1969) (health services with private hospital). These courts have not struggled with the meaning of "contract" for the purposes of section 1981. They have instead generally relied on the rather simplistic reasoning which Cornelius urges upon us: Section 1981 applies on its face to all contracts; section 1981 must be read broadly; the dispute involves a "contract" for other purposes; *ipso facto,* there is a cause of action under section 1981.

But surely section 1981 does not apply to all contractual relationships. For example, a black man could not bring an action against a white woman alleging that she had refused to consider marrying him because of his race. Marriage is a contractual relationship but it is also one of the most private of relationships, and this privacy interest has constitutional dimensions. Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). There is, thus, a constitutional brake on section 1981. *Cf.* Cook v. Advertiser Co., *supra,* 458 F.2d at 1123–1124 (Judge Wisdom, concurring).

But did the framers of section 1981 mean to enact a law which encompassed all contracts except those immunized by the Constitution? In *Civil Rights Cases,* 109 U.S. at 22, 3 S.Ct. at 30, the Court read the Congressional intent as being more limited:

[A]t that time (in 1866) Congress did not assume, under the authority given by the Thirteenth Amendment, to adjust what may be called the social rights of men and races in the community; but only to declare and vindicate those fundamental rights which appertain to the essence of citizenship,

and the enjoyment or deprivation of which constitutes the essential distinction between freedom and slavery.

In his famous dissent, 109 U.S. at 59, 3 S.Ct. at 55, Justice Harlan did not disagree with this distinction, only with its application:

[T]he court says that Congress did not, in the act of 1866, assume, under the authority given by the Thirteenth Amendment, to adjust what may be called the social rights of men and races in the community. I agree that government has nothing to do with social, as distinguished from technically legal, rights of individuals. No government ever has brought, or ever can bring, its people into social intercourse against their wishes. Whether one person will permit or maintain social relations with another is a matter with which government has no concern. I agree that if one citizen chooses not to hold social intercourse with another, he is not and cannot be made amenable to the law for his conduct in that regard; for even upon grounds of race, no legal right of a citizen is violated by the refusal of others to maintain merely social relations with him. . . . The rights which Congress, by the act of 1875, endeavored to secure and protect are legal, not social rights. The right, for instance, of a colored citizen to use the accommodations of a public highway, upon the same terms as are permitted to white citizens, is no more a social right than his right, under the law, to use the public streets of a city or a town, or a turnpike road, or a public market, or a post office, or his right to sit in a public building with others, of whatever race, for the purpose of hearing the political questions of the day discussed. Scarcely a day passes without our seeing in this court-room citizens of the white and black races sitting side by side, watching the progress of our business. It would never occur to any one that the presence of a colored citizen in a court-house, or court-room, was an invasion of the social rights of white persons who may frequent such places. And yet, such a suggestion would be quite as sound in law—I say it with all respect—as is the suggestion that the claim of a colored citizen to use, upon the same terms as is permitted to white citizens, the accommodations of public highways, or public inns, or places of public amusement, established under the license of the law, is an invasion of the social rights of the white race.

This distinction between "civil rights" and "social rights" has been a source of abuse. *See, e. g.,* Plessy v. Ferguson, 163 U.S. 537, 544, 16 S.Ct. 1138, 41 L. Ed. 256 (1896), where the Court identified segregation in the public schools as a "social" matter. But if the term "social rights" has any meaning, it would appear to apply here. Cornelius' interest in joining the private club of his choice surely does not constitute a basic right of citizenship. We recognize, of course, that "social rights" and "civil rights" are but extremes on the broad spectrum of the "social contract." Only recently have commentators turned their attention to the difficult question of the precise point at which the protection of section 1981 is triggered. *Cf.,* The Desegregation of Private Schools: Is Section 1981 The Answer?, 48 N.Y.U.L. Rev. 1147, 1165–68 (1973).

We do not wish, however, to be accused of forsaking the plain language of a statute for a foray into the dense underbrush of legislative history. Section 1981 on its face does apply to all contracts. The Court has said that statutes enforcing the Thirteenth Amendment must be "rational" and "appropriate" to the purposes of the Amendment, *Jones,* 392 U.S. at 440–444, 88 S.Ct. 2186, and surely it would be rational and appropriate for Congress to have determined that racial discrimination in all contracting save that protected by the Constitution should be abolished.

Judge Learned Hand counseled that when faced with a difficult problem of statutory construction, "[f]linch as we

**1200**

may, what we do, and must do, is to project ourselves, as best we can, into the position of those who uttered the words, and to impute to them how they would have dealt with the concrete occasion." United States v. Klinger, 199 F. 2d 645, 648 (2d Cir. 1952), aff'd per curiam, 345 U.S. 979, 73 S.Ct. 1129, 97 L. Ed. 1393 (1953). Looking back one hundred years, seeking to understand how the members of the 39th Congress would have voted on the question of discrimination by fraternal organizations, we do flinch.[26] Fortunately, however, the solution to the problem lies closer to home.

*The Need For Statutory Harmonization*

In 1964, Congress passed another landmark Civil Rights Act, 42 U.S.C. § 2000a et seq. Section 2000a prohibits discrimination with respect to "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation." Section 2000a(e) provides an exemption from this coverage:

> The provisions of this subchapter shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or

patrons of an establishment within the scope of subsection (b) of this section.

Clearly, membership in a private club is part of the "enjoyment" of that club. If, then, the Groton Elks is a private club within the meaning of the 1964 Act, Congress has immunized their discrimination with regard to membership from the coverage of that Act.

Assuming for the moment that the defendant lodge is a "private club," does its exemption from the coverage of the 1964 Act mandate reading a similar exemption into the 1866 Act?[27]

Since its resurrection in Jones v. Mayer, *supra*, the Civil Rights Act of 1866 has been a fruitful source of legal difficulty. We are not the first court to struggle with the interface between the 1866 Act and modern civil rights legislation. In *Jones* itself, the Court was asked to read the 1968 Civil Rights Act as a comprehensive substitute for section 1982. In rejecting this argument, the Court emphasized that there was no clear legislative intention to repeal section 1982 even by implication and, indeed, that the 1968 Act's savings clause provided that the statute would have no effect on prior legislation. 392 U.S. at 416–417, n. 20, 88 S.Ct. 2186. In *Sullivan*, 396 U.S. at 237, 90 S.Ct. 400, the Court similarly rejected the argument

26. Historians are far from agreement concerning the intentions of the 39th Congress. *Contrast*, the "revisionist" histories w ich emphasize the 39th Congress' ideological perspective and its perception that it was fundamentally changing the social contract, E. McKitrick, Andrew Johnson and Reconstruction (1960); J. H. Franklin, Reconstruction: After the Civil War (1961); W. Brock, An American Crisis (1963); L. and J. H. Cox, Politics, Principle and Prejudice, 1865–1866 (1963); J. McPherson, The Struggle for Equality (1964), *with* the more traditional view that the radicals had limited influence, H. K. Beale, The Critical Year: A Study of Andrew Johnson and Reconstruction (1930); W. A. Dunning, Reconstruction: Political and Economic 1865–1877 (1907, reissued 1962); C. Fairman, O. W. Holmes Devise History of the Supreme Court, Vol. VI, Pt. 1 "Reconstruction and Revision" (1971).

27. The Supreme Court left t is question open in Tillman v. Wheaton-Haven Recreation Ass'n, 410 U.S. 431, 438–439, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973). Below, the Fourth Circuit had held that the private club exemption applied in an action brought under 42 U.S.C. § 1982. 451 F.2d 1211 (1971). The Supreme Court found it unnecessary to reach this issue because the defendant recreation association was found not to come within the private club exemption. Two other courts have considered the issue, in cryptic fashion, Sims v. Order of United Commercial Travelers of America, 343 F. Supp. 112 (D.Mass.1972); Solomon v. Miami Woman's Club, 359 F.Supp. 41 (S.D.Fla. 1973), both concluding that "[m]embership in a private organization may not be secured by suit under the Civil Rights Acts." 359 F.Supp. at 44.

that the 1964 Act repealed section 1982, relying again on the absence of a clear legislative intent. Plaintiffs in *Sullivan* did not allege that specific provisions of the two statutes were in conflict, and the Court was careful to point out that the defendant organization was not a "private club." 396 U.S. at 236, 90 S.Ct. 400. Various lower courts have been asked to read the administrative procedures embodied in recent civil rights legislation into the 1866 Act, and most have declined to do so. *Compare*, Long v. Ford Motor Co., 496 F.2d 500 (6th Cir. 1974); Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979 (1973); Brady v. Bristol-Meyers Co., 459 F.2d 621 (8th Cir. 1972); Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971); Young v. ITT, 438 F.2d 757 (3d Cir. 1971); Smith v. Perkin-Elmer Corp., 373 F. Supp. 930 (D.Conn.1973), *with* Waters v. Wisconsin Steel Works of International Harvester Co., 427 F.2d 476 (7th Cir.), cert. denied, 400 U.S. 911, 91 S.Ct. 137, 27 L.Ed.2d 151 (1970). *Cf.*, Comment, Is Section 1981 Modified by Title VII of the Civil Rights Act of 1964?, 1970 Duke L.J. 1223.

■ These cases raised problems very different from that before this court. There was no irreconcilable substantive conflict between the 1866 Act and more recent legislation. There were no constitutional overtones making statutory harmonization advisable. Finally, those courts were asked in effect to emasculate, or substantially amend, the Act of 1866, not to read it as being inapplicable to a very limited area of endeavor. In the instant case, several factors combine to convince us that the 1964 Act's explicit private club exemption must be read by implication into section 1981.

■ First, "[c]ourts may properly take into account . . . [a] later Act when asked to extend the reach of . . . [an] earlier Act's vague language to the limits which, read literally, the words might permit." N.L.R.B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 193–194, 87 S.Ct. 2001, 2014, 18 L.Ed.2d 1123 (1967). *Cf.*, Hunter v. Erickson, 393 U.S. 385, 388, 89 S.Ct. 537, 21 L. Ed.2d 616 (1969).

■ Second, "[t]he provisions of one statute which specifically focus on a particular problem will always, in the absence of express contrary legislative intent, be held to prevail over provisions of a different statute more general in its coverage. *See, e. g.*, Kepner v. United States, 195 U.S. 100, 125, 24 S.Ct. 797, 49 L.Ed. 114 (1904)." General Electric Credit Corp. v. James Talcott, Inc., 271 F.Supp. 699, 705 (S.D.N.Y. 1966).

Third, the legislative history of the 1964 Act supports a harmonization of the statutes. When Congress passed the 1964 Act, it believed it was enacting the first federal legislation prohibiting private discrimination in public accommodations. Prior to Jones v. Mayer, *supra*, sections 1981 and 1982 were thought to apply only to "state action." 110 Cong. Rec. 1966 (1964) (remarks of Representative Lindsay). Thus, the absence of express language in the 1964 Act limiting the 1866 Act is hardly evidence of an intention not to have that effect.

To the contrary, the legislative history of the 1964 Act evidences a clear intention to immunize fraternal organizations from just this type of suit. Indeed, Congress appears to have doubted the very constitutionality of legislation which *did not* exempt private clubs. Leading opponents of the Act argued that people have a constitutional right to choose their associates. *See, e. g.*, 2 U. S.Code Cong. & Admin.News (1964), at 2459–2462 (Minority Report on the proposed act); 110 Cong.Rec. 2293 (remarks of Representative Long of Louisiana). Supporters responded by arguing that "where freedom of association might logically come into play as in cases of private organizations, title II quite properly exempts bona fide private clubs. . . . " 2 U.S.Code Cong. & Admin.News (1964), at 2495. (Additional views on the proposed act of seven

Representatives.) *See also*, 110 Cong. Rec. 6008, 6534 (remarks of Senator Humphrey); Tillman v. Wheaton-Haven Recreation Ass'n, 451 F.2d 1211, 1214–1215, n. 5 (4th Cir. 1971), rev'd on other grounds, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973).

Moreover, the savings clause in the 1964 Act, 42 U.S.C. § 2000a–6(b), does not preclude but rather provides for the possibility of a limitation of earlier legislation:

> The remedies provided in this subchapter shall be the exclusive means of enforcing the rights based on this subchapter, but nothing in this subchapter shall preclude any individual or any State or local agency from asserting any right based on any other Federal or State law *not inconsistent with this subchapter*, including any statute or ordinance requiring nondiscrimination in public establishments or accommodations, or from pursuing any remedy, civil or criminal, which may be available for the vindication or enforcement of such right. [Emphasis added.]

A fourth factor which supports harmonization is the necessity of reading section 1981 so as to avoid a danger of unconstitutionality. United States v. C. I.O., 335 U.S. 106, 120–121, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948). If section 1981 were to be read as plaintiff suggests, it would prohibit the Elks from freely choosing their social intimates—a questionable result under *Evans, Bell,* and *Moose Lodge, supra.*

While these cases are not precise as to their doctrinal foundations, they are based on as yet vaguely defined rights of association and privacy. There remains the perplexing question whether according constitutional protection to a private club's exclusion of one race from membership would in fact increase or decrease the overall amount of associational freedom, for a right to exclude one race would protect the associational rights of the group claiming such a right only at the expense of the arguable associational rights of those who are excluded. Professor Emerson has suggested that the better approach to the problem is by analysis of associational decisions as shielded from governmental scrutiny by a right to privacy:

> The right of the government to *compel* personal associations, as by forbidding racial discrimination in schools, housing, public facilities, clubs and the like, however, is surely not subject to resolution in terms of a blanket right of association or non-association. Rather such problems, as is also the case with measures prohibiting personal association, must be framed in terms of drawing the line between the public and private sectors of our common life. The question is, in short, one of the right of privacy. . . .

Emerson, Freedom of Association and Freedom of Expression, 74 Yale L.J. 1, 20 (1964).

■ In delimiting the right to privacy, two inquiries are essential. First, the strength of the particular claim to privacy asserted must in some manner be measured. Second, the state must demonstrate that it has a legitimate interest in proscribing the questioned conduct of sufficient strength to override the claim to privacy.

Members of genuinely private clubs have a substantial privacy interest with respect to membership practices. Truly fraternal organizations attempt to replicate the bonds of literal fraternity; the relationship among members is close, intimate, and continuing. Its members having genuinely chosen each other as social intimates, the club functions as an extension of their homes. Wright v. Cork Club, 315 F.Supp. 1143, 1156–1157 (S.D.Tex.1970). The State's interest in prohibiting discrimination in this context seems far from compelling:

> Viewed in the abstract, fraternal orders and social clubs with racially restrictive membership rules are not admirable institutions. . . . But when, moving from the abstract to the particular, one examines the

objectives and activities of particular fraternal orders and social clubs, membership restrictions based on any of these characteristics no longer seem automatically to be offensive. The correct adjective, rather, may be ludicrous, harmless, innocent, anachronistic, defensive, evanescent, inconsequential, functional, embattled, or praiseworthy. Even when the restrictions are invidious, a governmental program to discover and eradicate them necessarily imposes social costs; a society that tries to punish every instance of man's inhumanity to man may lose its humanity while crusading against the enemy.

Bittker and Kaufman, Taxes and Civil Rights, *supra,* 82 Yale L.J., at 86. This view of the balance of interests was evidently shared by the 88th Congress.[28]

In sum, we conclude that section 1981 does not apply to the membership "contracts" of truly private clubs.

*The Elks as a Private Club*

■ The remaining question is whether the Groton Elks is a "private club" within the meaning of the exemption to the 1964 Civil Rights Act. The case law reveals that a number of factors govern whether an organization is a "private club." The most important include: (a) the selectiveness of the group in the admission of members, Tillman v. Wheaton-Haven Recreation Ass'n, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973); Nesmith v. Y.M. C.A., 397 F.2d 96 (4th Cir. 1968); (b) the existence of formal membership procedures, United States v. Jack Sabin's Private Club, 265 F.Supp. 90 (E.D.La.1967); Stout v. Y.M.C.A., 404 F.2d 687 (5th Cir. 1968); (c) the degree of membership control over internal governance, particularly with regard to new members, Daniel v. Paul, 395 U.S. 298, 89 S.Ct. 1697, 23 L. Ed.2d 318 (1969); United States v. Jor-

dan, 302 F.Supp. 370 (E.D.La.1969); (d) the history of the organization, *e. g.,* was it created or did it make insubstantial changes in its prior operation in order to avoid the impact of civil rights legislation?, *Jordan, supra;* (e) the use of club facilities by non-members, Williams v. Rescue Fire Co., 254 F.Supp. 556 (D.Md.1966), Jack Sabin's Private Club, *supra;* (f) the substantiality of dues, *Jordan, supra;* (g) whether the organization advertises, *Daniel, supra, Jordan, supra;* (h) the predominance of profit motive, *Williams, supra. See generally, Jordan, supra,* 302 F.Supp. at 375–376.

■ The most significant factor, embodied in the first three variables, is membership practices. It is clear that the Elks pass muster on this score. At the time of the alleged violation of section 1981, the Elks' constitution provided that only white male citizens of the United States who believe in God and who live within the jurisdictional limits of the local lodge were eligible for membership. Thus, besides black males, other non-"whites," women, non-believers, aliens and out-of-towners were also not welcome. The constitution further provides that an applicant must answer various questions about his background and be sponsored by a member in good standing. The secretary of the lodge submits the application to the membership, and the chief officer refers it to a standing investigating committee composed of members of the lodge. As part of the investigative process, the applicant is required to appear before the committee. The report of the committee is presented to the membership at a regular meeting, and the entire membership is notified that the applicant will be considered at the next meeting. Three negative votes bar the applicant.

The history of the Elks is also instructive. The Benevolent Order evolved from a group of actors in New York City

---

**28.** *Contrast,* Railway Mail Ass'n v. Corsi, 326 U.S. 88, 65 S.Ct. 1483, 89 L.Ed. 2072 (1943), where the Court found that the state's interest in prohibiting discrimination in labor unions justified governmental intervention into membership practices.

in the 1860's known as the "Jolly Corks." Far from organizing for the purpose of frustrating civil rights legislation, the "Jolly Corks" formed their club in order to evade a New York State excise law which had closed the bars and theaters on Sundays. Ellis, An Authentic History of the B.P.O.E. (Chicago, 1910).

There is no need to inquire further into the sacred rituals of the Groton local. Cornelius has not suggested and there is no evidence that the Groton Lodge is other than what it appears to be—a subordinate lodge of the B.P.O.E. We can adequately evaluate it as a member of that genus.

As such, it is clear that Groton Lodge comes within the private club exception. During the rather abbreviated debate on the private club exception and on the correlative limitation on the jurisdiction of the Civil Rights Commission,[29] the Elks were specifically mentioned as an example of an exempted organization, and concern was repeatedly voiced for "local fraternal organizations." 110 Cong.Rec. 2292, 2294, 6008, 7407. Moreover, when confronted with Moose Lodge No. 107, the Supreme Court had no taxonomic difficulty: "Moose Lodge is a private club in the ordinary meaning of that term. It is a local chapter of a national fraternal organization having well-defined requirements for membership." Moose Lodge, supra, 407 U.S. at 171, 92 S.Ct. at 1970. It is also of some relevance that plaintiff here has stipulated that the Groton Lodge is a "private club" within the meaning of the 1964 Civil Rights Act.

We conclude, then, that because the defendant lodge is a private club and because the private club exception must be read into section 1981, plaintiff has no statutory cause of action. And, because plaintiff's tax claims are moot and will not support a claim for relief, we dismiss the entire action for failure to state a claim upon which relief can be granted.

## C. Caveat

The immunity we recognize today is a rather limited one. Whatever the freedom of legitimate Elks and Moose lodges to discriminate racially with respect to membership, if they do they stand to forfeit state aid, direct or indirect, which amounts to "encouragement." Moreover, only genuine "private clubs" are exempted from the 1866 and 1964 civil rights statutes. Those who believe that racial exclusion fosters fraternity are free to act out their belief, but they may not promote prejudice for profit. If a lodge were to diverge from the ways of the "Jolly Corks" and become an establishment where economic opportunity was the attraction, it would cease to be exempt: To have their privacy protected, clubs must function as extensions of members' homes and not as extensions of their businesses. Racial prejudice will not be permitted to infect channels of commerce under the guise of "privacy." In short, the courts will hold the Groton Elks to their own high standard of conviviality, as captured in James Barton Adams' *What is an Elk?*:

What is an Elk? Go where the antlered brothers
 In club room meet to pass an hour away,
Where each has jovial greeting for the others,
 And spirit of good fellowship holds sway.
Where pool balls click and "slough" clips change possession,
 Where smoke wreaths from cigars curl in the air,
Where jest and story fly without cessation
 From laughing lips. You'll find the answer there.

*Ellis, supra,* at 406.

---

29. 42 U.S.C. § 1975c(a)(6). It provides:
 Nothing in this or any other Act shall be construed as authorizing the Commission, its Advisory Committees, or any person under its supervision or control to inquire into or investigate any membership practices or internal operations of any fraternal organization, any college or university fraternity or sorority, any private club or any religious organization.

Brotherhood and charity being so essential a part of the defendant clubs' identities, we nourish the hope that the Elks and Moose have no continuing need for this limited immunity. It may well be that the eradication of the *"de jure"* racial restrictions signalled the end to discrimination by the clubs. In that case, "[t]he faults of our brothers will be written upon the sand; their virtues upon the tablet of love and memory," *Elks' Creed,* and the profound claims at the heart of this case will have been resolved more satisfactorily than a court could ever accomplish.

The complaint is dismissed.

So ordered.